IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Mary H.,[1] | ) | C/A No.: 1:20-cv-4096-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi,[2] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Mary Geiger Lewis, United States District Judge, dated December 8, 2020, referring this matter for disposition. [ECF No. 6]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 5].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Fed. R. Civ. P. 25(d), she is substituted for former Commissioner Andrew Saul as the defendant in this action.

Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On November 6, 2015, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on October 24, 2015. Tr. at 126, 128, 322–25, 326–36. Her applications were denied initially and upon reconsideration. Tr. at 185–89, 193–97. On May 10, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ann G. Paschall. Tr. at 65–93 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 6, 2018. Tr. at 157–81. On August 16, 2019, the Appeals Council remanded the case to the ALJ. Tr. at 182–84. Plaintiff appeared before the ALJ for a second hearing on February 12, 2020. Tr. at 38–64 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 10, 2020, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–37. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's

decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on November 25, 2020. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 43 years old at the time of the most recent hearing. Tr. at 43. She completed high school. *Id.* Her past relevant work ("PRW") was as a nursing assistant. Tr. at 86. She alleges she has been unable to work since October 24, 2015. Tr. at 322, 326.

2.    Medical History

On October 1, 2015, Plaintiff reported intermittent burning, itching, and swelling in her feet that had begun two months prior. Tr. at 503. She indicated the symptoms would appear after she was on her feet for longer than normal periods. *Id.* Melanie Johnson-Bailey, M.D. ("Dr. Johnson-Bailey"), noted normal gait and station and normal general range of motion ("ROM") of the joints. *Id.* She ordered lab studies and prescribed Hydrochlorothiazide for pedal edema. Tr. at 504–05.

On October 24, 2015, Plaintiff presented to the emergency room ("ER") at Aiken Regional Medical Centers ("ARMC"), after falling and injuring her left lower leg and lower lip. Tr. at 516. She complained of knee pain and

3

swelling. *Id.* Michael Annuziata, M.D. ("Dr. Annuziata"), observed Plaintiff to be in mild distress, to have swelling to the left knee, to demonstrate pain to palpation medially and over the patella, and to have severely limited ROM due to pain and swelling. Tr. at 517–18. He noted Plaintiff was comfortable after a Toradol injection. Tr. at 518. X-rays showed a mildly-displaced fracture of the lateral aspect of the tibial plateau, consistent with a Segond fracture, which had a high association with anterior cruciate ligament ("ACL") tear. Tr. at 520. Dr. Annuziata assessed a patellar fracture and knee pain, prescribed Naprosyn 375 mg, and instructed Plaintiff to follow up with orthopedic surgeon Ty Carter, M.D., within two days. Tr. at 518.

On October 26, 2015, Plaintiff presented to orthopedic physician assistant Jill La Posta ("PA La Posta") for left knee injury. Tr. at 533. She complained of pain with weightbearing and walking. *Id.* PA La Posta observed the following on left knee exam: no joint dislocation; no ecchymosis; no effusion; no erythema; no swelling; lateral joint line and lateral tibial plateau tenderness; no pes anserine bursa, prepatellar bursa, or medial joint line tenderness; painful, restricted active ROM to 120 degrees; and painful extension with normal active ROM. Tr. at 534. She assessed a closed fracture of the lateral portion of the left tibial plateau and ordered x-rays and magnetic resonance imaging ("MRI") of the left knee. *Id.* She recommended Plaintiff not bear weight and continue to use a brace. Tr. at 535.

On November 4, 2015, an MRI of Plaintiff's left knee showed: (1) ACL tear; (2) bucket-handle tear of the lateral meniscus with the posterior horn flipped anteriorly; (3) capsular avulsion of the lateral tibia (Segond fracture); (4) partial tear of the lateral collateral ligament ("LCL"); (5) full-thickness tear of the medial collateral ligament ("MCL"); and (6) edema in the musculature about the knee and small-to-moderate knee joint effusion. Tr. at 540–41.

Plaintiff presented to orthopedic surgeon David R. Kingery, M.D. ("Dr. Kingery"), for evaluation of her left knee on November 10, 2015. Tr. at 530. Dr. Kingery noted an MRI had confirmed an ACL tear, complete disruption of the MCL, and avulsion fracture of the capsule laterally. *Id.* Plaintiff reported being unable to bear weight in a knee immobilizer and instability in her left knee. *Id.* Dr. Kingery noted the following on left knee exam: significant laxity of the MCL with valgus stress; positive drawer test; lateral joint stable to stress; no effusion; normal pulses in foot; and comfort in full extension to 60 degrees of flexion. Tr. at 531. He assessed an ACL rupture and complete tear of the MCL. *Id.* He authorized a six-month disabled parking placard, recommended an ROM brace from 10 to 60 degrees and light strengthening, and advised Plaintiff to consider ACL reconstruction with Allograft. Tr. at 531–32.

Plaintiff followed up with Dr. Kingery for a recheck on November 24, 2015. Tr. at 528. She was 5' tall, weighed 123 pounds, and had a body mass index ("BMI") of 24.02. *Id.* She denied pain and swelling and indicated her symptoms were exacerbated by bearing weight and walking and relieved by elevation and rest. *Id.* Dr. Kingery observed the following as to Plaintiff's left knee: no swelling, ROM from zero to 50 degrees, more stable MCL with good endpoint, and +2 positive drawer test. Tr. at 529. He noted shift could not be tested because of MCL pain and laxity. *Id.* He assessed ACL rupture, educated Plaintiff on multiple wellness measures, prescribed Hydrocodone-Acetaminophen 5-325 mg, and planned for left ACL reconstruction surgery. *Id.*

On December 22, 2015, Dr. Kingery performed left knee arthroscopy with ACL reconstruction using Allograft, ToggleLoc, and WasherLoc screws. Tr. at 546–47.

Plaintiff followed up with Dr. Kingery on January 5, 2016. Tr. at 554. She rated her pain as an eight on a 10-point scale. *Id.* Dr. Kingery observed Plaintiff's incisions to be well-healed, her motion to be markedly limited at zero to 30 degrees, and her ACL to be quite stable. *Id.* He noted Plaintiff was reporting excessive pain and joint swelling. *Id.* He prescribed Hydrocodone-Acetaminophen 5-325 mg and recommended physical therapy ("PT") to restore ROM and mobility. *Id.*

Plaintiff presented to Hitchcock Healthcare for an initial PT evaluation and plan of care on January 13, 2016. Tr. at 590. She presented to the evaluation in a wheelchair and reported using crutches at home. Tr. at 591. Physical therapist Christopher Bruner ("PT Bruner") noted Plaintiff had decreased ROM, pain, weakness, and increased difficulty performing activities of daily living ("ADLs"). Tr. at 592. He indicated Plaintiff would benefit from skilled PT once or twice a week for 12 weeks. *Id.*

On January 19, 2016, Dr. Kingery noted Plaintiff remained very stiff, but indicated this was likely due to her MCL injury. Tr. at 561. He stated Plaintiff's incisions were well-healed and her ROM was from zero to 60 degrees. *Id.* He instructed Plaintiff to begin PT with aggressive ROM, prescribed Hydrocodone 5 mg, and indicated manipulation might be needed. Tr. at 562.

Plaintiff participated in PT on January 25 and 27 and February 3 and 5, 2016. Tr. at 586–87. A summary dated February 3, 2016, reflects that Plaintiff's progress was below expectations, despite her good motivation. Tr. at 585. PT Bruner noted Plaintiff's gait was improving, but she remained apprehensive as to weight bearing and was not progressing with ROM as expected. *Id.*

On February 9, 2016, Dr. Kingery indicated Plaintiff was very stiff with ROM from five to 80 degrees with firm endpoints. Tr. at 567. He stated

Plaintiff had worked aggressively with PT, but was essentially stuck. *Id.* He recommended manipulation under general anesthesia. *Id.* Plaintiff described shooting pain that occurred nocturnally. *Id.* She rated her pain as a six and indicated it was exacerbated by bearing weight and relieved by rest and use of a knee brace. *Id.*

Dr. Kingery performed manipulation of Plaintiff's left knee under anesthesia on February 19, 2016. Tr. at 572–73.

Plaintiff participated in additional PT on February 22, 23, 24, 25, and 26, March 2, 3, 7, 10, 14, 16, 17, 21, 23, 28, and 31, and April 4, 2016. Tr. at 578–84, 660–65.

On March 8, 2016, Dr. Kingery noted Plaintiff's left knee ROM was from zero to 85 degrees, even though it had been from zero to 95 degrees immediately following manipulation. Tr. at 681. He stated there was no evidence of deep infection or swelling. *Id.* He prescribed a two-week course of Prednisone as Plaintiff continued PT. *Id.* He indicated he would consider manipulation with arthroscopic debridement and a one- or two-day hospitalization for ROM and pain control. *Id.* Plaintiff reported excessive pain, but denied swelling. *Id.*

On March 24, 2016, state agency medical consultant James Taylor, D.O. ("Dr. Taylor"), reviewed the evidence and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry

50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally kneel, crouch, and crawl; and frequently balance and climb ramps/stairs/ladders/ropes/scaffolds. Tr. at 111–12, 121–22. A second state agency medical consultant, Stephen Burge, M.D. ("Dr. Burge"), assessed the same physical RFC on May 10, 2016. *Compare* Tr. at 111–12 *and* 121–22, *with* Tr. at 138–39 *and* 151–52.

On March 29, 2016, Dr. Kingery indicated Plaintiff demonstrated 90 degrees of flexion and up to 110 degrees if he pushed her. Tr. at 651. He stated Plaintiff remained weak in the knee, but was otherwise stable. *Id.* He changed Plaintiff's prescription for Hydrocodone-Acetaminophen from every four to six hours to every six hours, as needed. *Id.* He indicated Plaintiff should continue PT for aggressive work with flexion and quad strengthening and could begin ambulating with crutches, but without a brace. *Id.*

On March 31, 2016, Plaintiff complained of a three-week history of left-sided chest tightness "like a cramp" that occurred at night. Tr. at 602. Dr. Johnson-Bailey assessed tachycardia, prescribed Propranolol HCl ER 60 mg, refilled Plaintiff's other medications, and referred her to sleep medicine. Tr. at 603–04.

On April 5, 2016, Plaintiff presented to Lexington Medical Center ("LMC") Urgent Care for right-sided shoulder and chest discomfort. Tr. at

791. She reported it hurt to breathe and she felt sweaty and fatigued upon walking. *Id.* Nurse Practitioner Amy E. Conard ("NP Conard") assessed shortness of breath, chest wall pain, and right shoulder pain and instructed Plaintiff to follow up with her primary care physician ("PCP"). Tr. at 792–93.

Plaintiff was hospitalized at LMC for pulmonary embolism ("PE") and right lower lobe pneumonia on April 6 and 7, 2016. Tr. at 613–41. She was initially started on Enoxaparin and subsequently received Apixaban. Tr. at 616. A lower extremity Doppler ultrasound was negative for deep venous thrombosis. *Id.* Plaintiff was discharged on Rivaroxaban and medication for pain and nausea control and instructed to follow up with her PCP. *Id.*

On April 12, 2016, Dr. Kingery noted stiff left knee, ROM from zero to 80 degrees, and hesitancy to flex any further. Tr. at 649. He indicated Plaintiff was on anticoagulation therapy for PE. *Id.* He stated it was not practical to consider resolving Plaintiff's knee stiffness until she could be taken off anticoagulation. *Id.* He indicated Plaintiff should continue with home exercises, but recognized that PT would be delayed. *Id.*

Plaintiff reported occasional shortness of breath upon exertion during a follow-up visit with Dr. Johnson-Bailey on April 21, 2016. Tr. at 783. She indicated she was attempting to walk around as much as possible, but her full leg-length brace made walking difficult. *Id.* Dr. Johnson-Bailey refilled Hydrochlorothiazide and Propranolol and prescribed Xarelto. Tr. at 784.

Plaintiff was discharged from PT at Hitchcock Healthcare on April 27, 2016, due to medical complications. Tr. at 658.

Dr. Kingery observed Plaintiff's left knee ROM to be from zero to 90 degrees with excellent stability on May 24, 2016. Tr. at 702. He noted Plaintiff was regaining quad function, despite being out of PT due to anticoagulation treatment. *Id.* He recommended Plaintiff restart PT to restore ROM and moved her to a playmaker brace. *Id.* He stated Plaintiff remained impaired for any significant work activities. *Id.* He extended Plaintiff's disabled parking placard from six months to one year and prescribed Hydrocodone-Acetaminophen 5-325 mg, one to two tablets every six hours as needed for pain. *Id.*

Plaintiff returned to Hitchcock Healthcare for additional PT on June 8, 13, 23, and 27, July 19, and August 4, 2016. Tr. at 920–934, 1092–1115.

On June 28, 2016, Plaintiff reported increased function and less pain. Tr. at 703. Dr. Kingery noted Plaintiff's motion remained limited to 90 degrees, but she had no effusion and stable collateral and cruciate ligaments. *Id.* He indicated he would typically consider arthroscopic debridement and manipulation, but could not do so because Plaintiff remained on anticoagulation. *Id.* He prescribed Tramadol HCl 50 mg and instructed Plaintiff to continue PT. *Id.*

On July 5, 2016, Plaintiff underwent a sleep study that showed reduced total sleep time, but no significant sleep-disordered breathing. Tr. at 814.

Hitchcock Healthcare discharged Plaintiff from PT again on August 4, 2016. Tr. at 923. Plaintiff had noted her ability to walk had improved by 75%–85%, but her knee continued to give way. *Id.* She also complained of disturbed sleep and difficulty walking, ascending and descending stairs, transitioning from sitting to standing, and squatting. *Id.* Physical therapist Erica Hook indicated Plaintiff's overall progress had plateaued, likely secondary to her continued use of an auxiliary crutch and knee brace, despite encouragement to ambulate without them. Tr. at 924.

On August 9, 2016, Dr. Kingery observed Plaintiff was markedly-improved due to a home-strengthening program and bracing. Tr. at 704. He recorded ROM from zero to 105 degrees and weakness in full extension, but overall stability. *Id.* He instructed Plaintiff to continue the aggressive home-strengthening program and to follow up in six to eight weeks. *Id.*

On September 27, 2016, Dr. Kingery noted Plaintiff had persistent lack of flexion, but was achieving full extension. Tr. at 706. He indicated x-rays showed no significant changes from prior studies, with some early medial joint line narrowing. *Id.* He specified Plaintiff's flexion was from zero to 90 degrees, but she could flex to 110 degrees with force. *Id.* He stated Plaintiff had some mild atrophy to the left knee and continued to use a cane to

12

ambulate. *Id.* He indicated the ACL was stable. *Id.* Dr. Kingery recommended arthroscopic surgery with manipulation to release any scar tissue and help Plaintiff obtain full flexion. Tr. at 707. He acknowledged Plaintiff would require some form of anticoagulation over the postoperative period. *Id.*

Dr. Kingery performed left knee arthroscopy with synovectomy and manipulation under anesthesia on November 11, 2016. Tr. at 709–14.

Plaintiff followed up with Dr. Kingery on November 22, 2016. Tr. at 715. Dr. Kingery noted Plaintiff had achieved left knee ROM to 140 degrees immediately following surgery, but was only able to flex to 120 degrees when pushed and with discomfort. *Id.* He recommended a cortisone injection and resuming PT. *Id.*

On December 8, 2016, Plaintiff reported her pain had not improved following knee surgery. Tr. at 771. Dr. Johnson-Bailey observed Plaintiff to be using a cane and bearing weight on her right side. Tr. at 773. She renewed Plaintiff's medications and indicated it was safe for her to increase to two Amitriptyline tablets nightly. *Id.*

Plaintiff returned to Hitchcock Healthcare for a PT evaluation on December 12, 2016. Tr. at 935. Physical therapist Henry Clay Holton, Jr., observed Plaintiff to have significantly-decreased left knee active ROM, decreased left lower extremity strength, and decreased quad control. Tr. at

936. He recommended Plaintiff engage in PT twice a week for eight weeks. Tr. at 937.

Plaintiff participated in PT on December 12, 16, 22, and 29, 2016 and January 3, 9, 11, 16, 18, 24, and 26, and February 3, 2017. Tr. at 938–61, 1209–16.

On December 13, 2016, Plaintiff described dull, aching, and throbbing pain in her left knee that occurred intermittently. Tr. at 716. She rated it as a seven. *Id.* Dr. Kingery noted Plaintiff continued to be weak, but was achieving 110 to 120 degrees of flexion regularly. *Id.* He recommended continued PT, focusing more on strengthening and less on motion. *Id.* He stopped Hydrocodone-Acetaminophen 10-325 mg and prescribed Hydrocodone-Acetaminophen 5-325 mg. Tr. at 717.

On January 10, 2017, Plaintiff rated her pain as an eight and described it as sharp, aching, throbbing, and radiating from her left medial knee to the lower leg. Tr. at 718. Dr. Kingery noted Plaintiff was markedly-improved over the prior two months, with 115 degrees of flexion, five degrees of hyperextension, and stable collateral ligaments. *Id.* He encouraged Plaintiff to continued ongoing strengthening through PT. *Id.*

Plaintiff complained of itching, redness, and burning in her hands on January 12, 2017. Tr. at 768. Dr. Johnson-Bailey observed some erythema in

Plaintiff's bilateral fingertips, but no edema and full ROM of all digits and both wrists. Tr. at 769. She prescribed Prednisone 10 mg. *Id.*

Plaintiff presented to LMC Urgent Care with right hand pain, tingling, and burning on January 25, 2017. Tr. at 797. Marcia Taylor, M.D., noted positive Tinel's and Phalen's signs of the right wrist, but no other abnormal findings on exam. Tr. at 799. She prescribed Prednisone 20 mg and ordered administration of Acetaminophen 500 mg for an acute headache. *Id.*

Plaintiff complained of intermittent pain in her right hand that was associated with burning, itching, and throbbing on January 30, 2017. Tr. at 724. She stated pain and stiffness were exacerbated by use of the wrist and hand. *Id.* X-rays of Plaintiff's right hand were normal. Tr. at 723. PA La Posta observed decreased sensation throughout Plaintiff's right hand, tenderness at the right carpal tunnel, painful active ROM on extension, positive Phalen's test, and positive Tinel's sign. Tr. at 726. She assessed carpal tunnel syndrome of the right wrist, referred Plaintiff for electromyography ("EMG") and nerve conduction studies ("NCS"), and placed her in a brace. Tr. at 726–27. She indicated she was unable to prescribe anti-inflammatory medications because Plaintiff was on blood thinners. Tr. at 727.

On February 7, 2017, Dr. Kingery noted Plaintiff had maintained ROM from zero to 115 degrees, but remained weak and required use of a cane. Tr. at 728.

Plaintiff complained of numbness and tingling of the bilateral wrists on February 17, 2017. Tr. at 730. She described pain, stiffness, numbness, and weakness and indicated her symptoms were exacerbated by use of the hands and wrists. *Id.* PA La Posta noted EMG and NCS were negative. Tr. at 731. She observed decreased sensation of the entire right hand; tenderness at the bilateral carpal tunnels; painful flexion and extension of both wrists; and positive Phalen's test and Tinel's sign at the right carpal tunnel. *Id.* She injected Plaintiff's bilateral carpal tunnels to address inflammation and assessed acute pain of the bilateral wrists. *Id.*

Plaintiff complained of itching and burning in her left hand on March 7, 2017. Tr. at 765. Dr. Johnson-Bailey observed Plaintiff to be using a cane for ambulation. Tr. at 767. She assessed idiopathic peripheral neuropathy and prescribed Gabapentin 100 mg three times a day for burning in Plaintiff's hands and feet. *Id.*

Plaintiff presented to LMC Urgent Care with a rash on her arms on March 30, 2017. Tr. at 800. Physician assistant Travis Stuckey observed minimal erythema of a macule on the left upper forearm and right forearm. Tr. at 801. He assessed urticaria and prescribed Cetirizine HCl 10 mg and Ranitidine HCl 150 mg. *Id.*

On April 21, 2017, Plaintiff presented to LMC Urgent Care for bruising and edema to the right upper extremity. Tr. at 802. She endorsed some

shortness of breath. *Id.* Nurse Practitioner Jennifer W. Askins noted Plaintiff's right forearm was swollen and extremely red. Tr. at 803. She transferred Plaintiff to the ER at LMC for further evaluation, given her observations and Plaintiff's history of PE. Tr. at 804.

Plaintiff was admitted to LMC from April 22 through April 27, 2017, for treatment of hyperglycemia, right arm cellulitis, and sepsis. Tr. at 1121. She underwent right wrist skin blister punch biopsy. Tr. at 1132. She was started on intravenous antibiotics and resumed use of Xarelto. Tr. at 842.

Plaintiff followed up with Dr. Johnson-Bailey for chest pain and possibly stopping Xarelto on April 27, 2017. Tr. at 762. She indicated she had recently been prescribed a five-day course of intravenous antibiotics for cellulitis of the right wrist. *Id.* She denied chest pain, but reported she easily developed shortness of breath. *Id.* Dr. Johnson-Bailey observed evidence of previous blistering of the right ventral wrist, but no intact blisters or signs of infection. Tr. at 764. She informed Plaintiff that it could take six to eight weeks for shortness of breath due to lung infiltrate to resolve. *Id.* She indicated she would order a chest x-ray and consider stopping Xarelto upon resolution of shortness of breath. *Id.*

Plaintiff presented to the ER at ARMC for edema in her bilateral feet on May 20, 2017. Tr. at 983. She also complained of pain and swelling in her right third finger. *Id.* Nathan Miller, M.D. ("Dr. Miller"), noted redness and

17

peeling of the bilateral feet and right hand. Tr. at 985. He treated redness, pain, and swelling of Plaintiff's right third finger with Keflex and instructed her to follow up with her PCP. *Id.*

Plaintiff complained of itching, burning, and peeling in her right hand and feet on May 24, 2017. Tr. at 758. Ashley Wiggins, M.D. ("Dr. Wiggins"), observed peeling of the skin on Plaintiff's right hand and both plantar feet and cracking between her toes. Tr. at 760. She indicated she would treat it as a fungal infection and prescribed Miconazole Nitrate 2% external cream and Miconazole Nitrate 2% powder. Tr. at 761.

Plaintiff presented to LMC Urgent Care for left forearm and hand swelling on May 29, 2017. Tr. at 805. Nurse practitioner Constance Parson noted urticaria on Plaintiff's left inner thigh and left forearm warmness and swelling. Tr. at 806. She ordered a SoluMedrol injection and prescribed Diphenhydramine HCl 25 mg and Prednisone 20 mg. Tr. at 807. She referred Plaintiff to the ER for an ultrasound of her left forearm, given her history of PE. *Id.*

Plaintiff followed up in the ER at LMC, where a Doppler ultrasound was negative. Tr. at 1154. Her d-dimer was elevated, and Stephen A. Grant, M.D., recommended she go back on Xarelto and follow up with her doctor. Tr. at 1155.

Plaintiff presented to LMC Urgent Care with right hand inflammation and swelling in her feet on June 13, 2017. Tr. at 808. NP Conard observed swelling, tenderness, redness, and limited ROM in Plaintiff's right hand. Tr. at 809. She referred Plaintiff to the ER at LMC for further evaluation. Tr. at 810.

Plaintiff was subsequently hospitalized at LMC from June 13 through June 18, 2017, for cellulitis of the right hand that was not responding to antibiotics. Tr. at 1162. She received intravenous Vancomycin and Zosyn, after an infectious disease consultation. *Id.* She was released on Xarelto, a proton pump inhibitor, and a probiotic. *Id.*

Fernando X. Castro, M.D. ("Dr. Castro"), saw Plaintiff for a rheumatology consultation for hand pain and swelling on June 16, 2017. Tr. at 733. Plaintiff described periodic episodes of right hand pain and swelling that initially presented around April 2016. *Id.* She indicated the symptoms would last for days to weeks and sometimes affected her left hand, bilateral feet, metacarpophalangeal ("MCP") joints, proximal interphalangeal ("PIP") joints, and wrists. *Id.* Dr. Castro noted Plaintiff had undergone a skin biopsy that suggested a diagnosis of spongiotic dermatitis. *Id.* He indicated Plaintiff was on antibiotics for cellulitis with some improvement and had negative rheumatoid factor and borderline positive antinuclear antibodies ("ANA"). *Id.* He observed moderate diffuse swelling and redness involving Plaintiff's right

19

arm and forearm that was less pronounced in the hand, with associated tenderness and warmth to palpation. Tr. at 736. He recorded normal findings on inspection of Plaintiff's left arm and bilateral lower extremities. *Id.* He noted Plaintiff had right upper extremity cellulitis, underlying periodic skin rash, and spongiotic dermatitis, as proven by biopsy. Tr. at 737. He acknowledged Plaintiff also had periodic inflammatory symptoms involving her hands and feet that were of unclear etiology. *Id.* He ordered lab studies and instructed Plaintiff to follow up in two to three weeks. *Id.*

Plaintiff presented to LMC Urgent Care with hives on June 26, 2017. Tr. at 811. Dale R. Blizzard, M.D., noted rare urticarial-type lesions on Plaintiff's upper extremities. Tr. at 813. He assessed urticaria and prescribed Cetirizine and Hydroxyzine. *Id.*

On July 13, 2017, Plaintiff continued to endorse problems with her hands and reported breaking out in hives. Tr. at 753. Dr. Johnson-Bailey noted some excoriations on Plaintiff's bilateral eyes and erythematous palms. Tr. at 756. She administered a Diphenhydramine injection, ordered a lupus panel, and prescribed Ranitidine for gastroesophageal reflux disease ("GERD") and Clobetasol Propionate 0.05% external cream for spongiotic dermatitis and urticaria. *Id.* She encouraged Plaintiff to follow up with a dermatologist and a rheumatologist. *Id.*

Plaintiff followed up with Dr. Castro on July 19, 2017. Tr. at 739. Dr. Castro noted small scabs in the dorsum of Plaintiff's hands that were not active at the time, mild swelling to the dorsum of her hands and fingers, associated tenderness-to-palpation greater in the PIP joints than the MCP joints, and mild-to-moderate discomfort to MCP compression, bilaterally. Tr. at 742. He observed no abnormalities in Plaintiff's lower extremities. *Id.* He noted his concern for chronic inflammatory joint disease, given the joints involved. Tr. at 743. He indicated lab studies had showed elevated erythrocyte sedimentation rate ("ESR") and C-reactive protein ("CRP"), but negative rheumatoid factor and cyclic citrullinated peptide ("CCP"). *Id.* He ordered additional lab studies and prescribed intravenous SoluMedrol 40 mg with a plan to transition Plaintiff to oral Prednisone 40 mg. *Id.*

On July 25, 2017, Plaintiff reported a fall due to her left knee giving way. Tr. at 1386. Dr. Kingery noted no swelling, stable collateral and cruciate ligaments, ROM from zero to 125 degrees, and some mild ongoing quadriceps weakness in Plaintiff's left knee. Tr. at 1386–87. He indicated examination of Plaintiff's right knee was normal. Tr. at 1387. He assessed synovitis of the knee and started Plaintiff on Naprosyn pending rheumatological workup. *Id.*

Plaintiff presented to the ER at LMC on August 6, 2017, for right hand swelling and redness with streaking up her forearm. Tr. at 1187. Maxcy H. Nowell, M.D., diagnosed arm edema, superficial venous thrombosis of the

arm, and hives and instructed Plaintiff to stop Xarelto, start Eliquis, and follow up with Dr. Johnson-Bailey in a week. Tr. at 1192.

Plaintiff complained of pain and swelling in her right hand on August 14, 2017. Tr. at 852. Dr. Castro noted Plaintiff was recently diagnosed with thrombosis of the right arm and was on anticoagulation medication. *Id.* He ordered additional lab studies and prescribed Prednisone 5 mg and Hydroxychloroquine 200 mg. Tr. at 857.

On October 12, 2017, Plaintiff reported moderate-to-significant improvement on Hydroxychloroquine and Prednisone. Tr. at 879. She rated her wrist, right knee, and bilateral ankle pain as a one and had no evidence of swelling or stiffness. *Id.* She denied side effects from her medications. *Id.* Dr. Castro observed Plaintiff to have slow gait with use of a cane; to demonstrate normal ROM in her shoulders, elbows, hands, wrists, knees, ankles, and feet; to have no swelling or synovitis in her joints; to have normal muscular strength in her upper and lower extremities; and to have normal grip strength bilaterally. Tr. at 884. He assessed rheumatoid arthritis ("RA") of multiple sites with negative rheumatoid factor. *Id.* He ordered lab studies and prescribed Leflunomide 10 mg. Tr. at 885.

Plaintiff reported improved knee function on October 24, 2017. Tr. at 892. Dr. Kingery noted left knee ROM from zero to 125 degrees with good clinical stability. *Id.* He stated Plaintiff's quadriceps remained weak, but

were much stronger than during earlier exams. *Id.* He advised Plaintiff to continue working aggressively on quadriceps strengthening and to follow up in three months. Tr. at 893.

Plaintiff complained of an itchy rash on her arms on December 6, 2017. Tr. at 745. She weighed 172 pounds and her BMI was 33.11. Tr. at 747. Her blood pressure was elevated at 153/80 mmHg. *Id.* Dr. Johnson-Bailey noted a urticarial rash on Plaintiff's bilateral upper extremities. *Id.* She administered a Dexamethasone injection for the rash and instructed Plaintiff to take Benadryl when she returned home. *Id.*

Plaintiff presented to LMC Urgent Care on January 2, 2018, after injuring her toes on her left foot. Tr. at 900. X-rays showed a nondisplaced fracture near the base of the proximal phalanx on her fourth toe and moderate dorsal soft tissue swelling. Tr. at 903. NP Conard noted bruising and tenderness and assessed a broken toe. Tr. at 902.

On January 17, 2018, Plaintiff reported no benefit with combination therapy and persistent pain involving her hands, wrists, and ankles. Tr. at 907. She indicated swelling and stiffness in her hands had increased when she attempted to taper down Prednisone. *Id.* Dr. Castro observed the following: normal gait without an assistive device; normal ROM of the elbows, shoulders, wrists, knees, and ankles; no evidence swelling or synovitis in the wrists, knees, ankles, or feet; mildly puffy hands; mild TTP of

the bilateral MCP and PCP joints; mild discomfort bilaterally on MCP compression test; decreased grip strength bilaterally; and normal muscular strength in the bilateral upper and lower extremities. Tr. at 912. He discontinued Leflunomide, prescribed Methotrexate, continued Hydroxychloroquine and Prednisone, and ordered lab studies. Tr. at 913. He indicated Plaintiff should try to taper Prednisone down to 2.5 mg daily over the next few weeks. *Id.*

On February 12, 2018, Dr. Boyer referred Plaintiff to PT for evaluation and treatment of left ankle pain and altered gait. Tr. at 722.

Plaintiff was hospitalized for PE at LMC from February 27 through March 1, 2018. Tr. at 1011–90. She was discharged with a prescription for Prednisone 5 mg. Tr. at 1018.

On March 6, 2018, Dr. Johnson-Bailey noted Plaintiff had not missed any doses of Xarelto prior to being hospitalized the prior week for PE. Tr. at 992. Plaintiff continued to endorse left-sided chest pain, but denied shortness of breath, except for sometimes when she walked. *Id.* Dr. Johnson-Bailey noted Plaintiff used a cane for ambulation. Tr. at 995. She increased Hydrochlorothiazide from 12.5 mg to 25 mg and refilled Gabapentin and Hydroxyzine. *Id.*

Plaintiff presented to Lexington Oncology Hematology on March 21, 2018. Tr. at 1220. Perrie L. Ryan, M.D., indicated there was no clear evidence

24

of new PE by repeat computed tomography ("CT") angiogram and pulmonary ventilation and perfusion scan. Tr. at 1224. He noted leukocytosis was likely related to chronic steroid therapy, as Plaintiff had no evidence of infection. *Id.* He indicated Plaintiff had been on chronic oral iron-replacement therapy. *Id.* He ordered lab studies. *Id.*

Plaintiff denied new complaints during a visit with Dr. Ryan on April 18, 2018. Tr. at 1239. Dr. Ryan noted Plaintiff's lupus anti-coagulant was positive and recommended it be repeated at 12-week intervals. Tr. at 1243. He noted that if it remained positive, Plaintiff would meet criteria for antiphospholipid syndrome. *Id.* He planned to perform hemoglobin electrophoresis for microcytic anemia. *Id.* He assessed history of PE, iron deficiency anemia, antiphospholipid antibody positive, neutrophilic leukocytosis, and anemia of chronic disease. Tr. at 1243–44.

Plaintiff presented to Hector Rodriguez, M.D. ("Dr. Rodriguez"), at Allergy Partners of the Midlands for evaluation of urticaria on May 31, 2018. Tr. at 1443. She endorsed exercise-triggered shortness of breath and a two-year history of hives. *Id.* She described a rash characterized by large erythematous plaques that occurred every other day. *Id.* She indicated she had pruritic lesions on her arms, shoulders, and buttocks. *Id.* She indicated she was being treated with Prednisone, Methotrexate, and Plaquenil for RA. *Id.* Dr. Rodriguez observed large erythematous plaques on Plaintiff's arms,

right shoulder, and left hip. Tr. at 1445. He suspected Plaintiff's chronic urticaria and itching was a spontaneous/idiopathic process, given her autoimmune disease. *Id.* An allergy panel was positive for reactions to dust mites and cockroaches, and Plaintiff demonstrated turbinate hypertrophy, suggestive of aeroallergies. *Id.* Dr. Rodriguez instructed Plaintiff to start Cetirizine 10 mg, up to two tablets twice a day, Ranitidine 150 mg, twice a day, and Singulair 10 mg daily. Tr. at 1445–46. He also prescribed Hydroxyzine HCl 25 mg. Tr. at 1446. He indicated he would consider prescribing Xolair if Plaintiff's symptoms failed to respond. *Id.*

On June 9, 2018, Plaintiff presented to Jim F. Byrd, Jr., M.D. ("Dr. Byrd"), for a consultative exam. Tr. at 1271. She alleged left knee pain, low iron, RA, and PE. *Id.* She endorsed shortness of breath upon walking even short distances. *Id.* Dr. Byrd observed Plaintiff to ambulate with a cane and a left knee brace. *Id.* He noted normal findings on physical exam, aside from limited flexion of the left knee. Tr. at 1273–74, 1275. Dr. Byrd opined that Plaintiff's chronic left knee condition limited "her capacity for strenuous activity that required running, shopping, kneeling, squatting or other strenuous activities." Tr. at 1275. He acknowledged Plaintiff's reports of intermittent pain in her bilateral hands and feet due to RA, but observed no abnormalities or tenderness on exam. *Id.* He felt that Plaintiff's RA did not impose limitations. *Id.* He indicated Plaintiff's history of PE and shortness of

26

breath "decrease[d] her capacity for an occupation that require[d] strenuous activities." *Id.*

On August 8, 2018, Plaintiff reported she continued to experience hives every other day. Tr. at 1450. Dr. Rodriguez noted Plaintiff had recently presented to Urgent Care for facial swelling and required a steroid injection. *Id.* He noted normal findings on exam. Tr. at 1452. Dr. Rodriguez ordered Xolair 300 mg infusions every four weeks for treatment of chronic idiopathic urticaria. Tr. at 1367. He also ordered an Epinephrine pen for infusion appointments. Tr. at 1453.

Plaintiff underwent Xolair infusions on September 4 and October 2, 2018. Tr. at 1370, 1377. She tolerated the infusions without complications. *Id.*

On October 16, 2018, Plaintiff was treated in the ER at LMC for fluid retention in her legs, bacterial skin infection, and immune disease. Tr. at 1285. She received prescriptions for Acetaminophen-Codeine, Doxycycline, and Prednisone. *Id.*

On October 17, 2018, Plaintiff reported significant improvement in symptoms since starting Xolair. Tr. at 1454. She indicated her symptoms had decreased in severity and would flare once a week instead of every other day. *Id.* Dr. Rodriguez observed Plaintiff's left lower leg to be edematous. Tr. at 1456. He also noted three wheals on Plaintiff's left arm and mild, scaly

xerosis of the hands. *Id.* He continued Plaintiff on the same course of treatment. Tr. at 1457.

Plaintiff underwent a third Xolair infusion on October 30, 2018, and tolerated it without complications. Tr. at 1382.

Plaintiff presented to the ER at ARMC on December 3, 2018, for swelling in her lips. Tr. at 1301. She was discharged with diagnoses of chest pressure, allergic reaction, angioedema, and hyperlipidemia. *Id.* She received a prescription for an Epinephrine injectable kit. Tr. at 1315.

Plaintiff presented to the ER at LMC with urticaria on January 6, 2019. Tr. at 1317. Thomas Richard Hall, M.D., instructed Plaintiff to take Prednisone 40 mg for four days and then start Prednisone 5 mg daily. *Id.* He advised Plaintiff to take Claritin 10 mg once a day and Pepcid 20 mg twice a day to help control hives. *Id.*

Plaintiff presented to the ER at ARMC on January 22, 2019. Tr. at 1325. The attending physician prescribed a Medrol Dosepak and instructed Plaintiff to follow up with Dr. Johnson-Bailey in two to four days. Tr. at 1326.

Plaintiff presented to Palmetto Infusion for a Xolair infusion on March 19, 2019. Tr. at 1396. She tolerated the infusion without complications, but reported her lips were swelling and her hives were returning at times. *Id.*

On April 18, 2019, Plaintiff reported she had been unable to receive Xolair infusions from November to late-March because of an insurance

problem. Tr. at 1458. She indicated she did poorly over that period, experiencing lip swelling and daily hives. *Id.* She denied lip swelling since restarting Xolair infusions, but indicated she continued to experience hives. *Id.* She also endorsed joint pain and weight gain. *Id.* Dr. Rodriguez observed numerous erythematous wheals on Plaintiff's bilateral arms. Tr. at 1460. He continued Plaintiff's course of treatment and instructed her that she could take 25 to 50 mg of Hydroxyzine at night for itching. *Id.*

Plaintiff received Xolair infusions on April 30, May 28, June 24, July 29, and August 27, 2019. Tr. at 1400–01, 1403–04, 1406–07, 1409–10, 1412–13. She reported the infusions helped her symptoms during the April visit, denied changes during the May visit, stated the infusions helped a little during the June visit, said they were not helping during the July visit, and denied changes during the August visit. *See id.*

The frequency of Plaintiff's Xolair infusions was increased, and she received infusions on September 9 and 23 and October 7 and 21, 2019. Tr. at 1415–16, 1418–20, 1422–23, 1480. She reported the infusions were helping. Tr. at 1416, 1420, 1422.

On October 3, 2019, Plaintiff presented to Dr. Kingery for recurrent left knee instability and pain. Tr. at 1350. Dr. Kingery noted no left knee effusion, positive +1 drawer test, positive +1 Lachman's test, negative pivot shift, ROM from zero to 130 degrees, and good strength. Tr. at 1352. He

reviewed x-rays that showed hardware consistent with ACL reconstruction and medial joint line narrowing consistent with medial arthrosis. *Id.* He ordered a playmaker brace and administered an injection. Tr. at 1352, 1354.

On October 22, 2019, Dr. Rodriguez noted Plaintiff had significant resolution of hives when Xolair dosage was changed to every two weeks. Tr. at 1464. He indicated RA continued to cause problems with Plaintiff's hands. *Id.* He observed an edematous left lower leg and numerous erythematous wheals on Plaintiff's bilateral arms. Tr. at 1466. He continued Plaintiff's treatment and noted she might be able to wean off other medications if her hives could be controlled. Tr. at 1466–67.

Plaintiff received Xolair infusions on November 5 and 20 and December 3, 17, and 31, 2019 and January 14, 2020. Tr. at 1426–27, 1429–30, 1432–33, 1435–36, 1438–39, 1441–42.

Plaintiff visited the ER at ARMC for a rash with odorous discharge on January 10, 2020. Tr. at 1503. The attending physician assessed cellulitis that likely started as a fungal infection and prescribed Keflex 500 mg, ibuprofen 800 mg, and Bacitracin topical ointment. Tr. at 1504.

C.    The Administrative Proceedings

 1.    The Administrative Hearing

  a.    Plaintiff's Testimony

   i.    May 10, 2018

At the first hearing, Plaintiff testified she lived in her parents' home with her 20-year-old daughter and 18-year-old son. Tr. at 70. She stated she had a learner's permit, as her driver's license had expired. Tr. at 70–71. She denied being able to drive because her medications made her drowsy. Tr. at 71. She reported her father drove her to her medical appointments. *Id.*

Plaintiff testified she had worked as a certified nursing assistant ("CNA") at National Health. *Id.* She stated her job duties had included lifting, turning, and feeding patients, changing linens, making beds, and using machines to lift. *Id.* She said she performed similar work at Pruitt Health and Daybreak Adult Care. Tr. at 71–72.

Plaintiff denied having worked anywhere since October 24, 2015. Tr. at 72. She said she injured her left knee when it gave way as she was walking down the stairs in her home. *Id.* She denied having filed for workers' compensation, as the injury did not occur while she was working. *Id.* She stated she had undergone three surgeries on her left knee. *Id.* She indicated her left knee caused pain and had contributed to additional falls. *Id.* She said she had been using a cane in her right hand since her injury. Tr. at 72–73.

Plaintiff confirmed she was right-handed and was using a brace on her right wrist due to carpal tunnel syndrome. Tr. at 72. She indicated she had been using the brace for about a year. *Id.* She stated her hand would swell up. *Id.* She said she had undergone a puncture test on her right hand, but had not had surgery. *Id.* She indicated she sometimes had problems with her left hand, as well. Tr. at 73–74.

Plaintiff admitted that she had a PE in April 2016 and another one early in 2018. Tr. at 74. She stated she used Xarelto, a blood thinner, to decrease her risk of additional PEs. *Id.*

Plaintiff testified she elevated her legs above her waist-level for 30 minutes per hour to keep them from swelling. Tr. at 75. She indicated she watched television while doing so. *Id.*

Plaintiff estimated she could sit for 30 minutes. *Id.* She said she could walk for three to five minutes while using her cane. Tr. at 75–76. She indicated she could stand for about five minutes. Tr. at 76. She admitted she could lift a gallon of milk, but denied being able to carry it around all day. *Id.* She stated her children had to help her wash her left foot and tie her shoes because she had difficulty bending her knee and could not bend down. *Id.* She said her hands would swell and turn red. Tr. at 77.

Plaintiff testified she had difficulty sleeping due to pain and depression. *Id.* She said she would sometimes doze off several times during

the day for about 20 minutes at a time. *Id.* She stated she had knocked out a tooth when she sustained a fall four months prior, while trying to prepare food. Tr. at 78. She indicated her mother had subsequently prepared food for her. *Id.* She said she would dust or try to sweep the floor if she was having a good day, but had to sit down and get back up repeatedly to complete the job. *Id.* She stated she visited the grocery store with her parents and used the motorized cart. *Id.* She testified she had moved in with her parents after she sustained the injury in 2015. Tr. at 79.

Plaintiff stated she was using two crutches to ambulate after her injury and prior to her first surgery. *Id.* She indicated she participated in PT that resulted in little improvement. Tr. at 80. She confirmed that treatment for her knee was put on hold following the PE in 2016, as she was put on anticoagulants. *Id.* She said she resumed treatment for her knee after the anticoagulant therapy was discontinued. *Id.* She said the subsequent therapy did not help much, as her knee remained weak. *Id.* She stated her pain was aggravated if she attempted to sit with her feet on the floor and her knee bent at a 90-degree angle. Tr. at 81. She indicated her knee would swell every other day and she would prop it up to reduce the swelling. *Id.*

Plaintiff testified she also experienced numbness and tingling in her feet every other hour. Tr. at 81–82. She said she developed increased swelling and inflammation if she attempted to stand and walk for too long. Tr. at 82.

She estimated spending 50% of a typical day either lying down or reclining with her feet elevated. *Id.*

Plaintiff admitted her pain medication was effective, reducing her pain from a seven or eight to a one. Tr. at 83. She indicated her pain increased when she attempted to perform activities. *Id.* She testified her doctor had authorized a disabled placard. *Id.* She said she would sometimes wash clothes, but her mother would help her to get the clothes out of the washing machine. Tr. at 83–84.

Plaintiff confirmed she used an inhaler. Tr. at 85. She said she sometimes felt tired and short of breath when she walked. *Id.* She felt her shortness of breath was related to the PE. *Id.*

### ii.     February 12, 2020

During the second hearing, Plaintiff testified she lived alone. Tr. at 43. She said her driver's license had expired. *Id.* She stated South Carolina Vocational Rehabilitation had initially placed her in a job where she assisted an elderly woman at Kennedy Assisted Living. Tr. at 44. She indicated she was subsequently required to travel to patients' houses, cook, and attempt to bathe and assist them to meet basic needs. *Id.* She said she worked two to four hours a day, five days a week. *Id.* She stated she performed the same type of work with CSRA, where she continued to be employed, but on leave due to her feet turning colors. Tr. at 45. She confirmed her work with CSRA

was sometimes full-time, as she was attempting to financially assist her son, who was attending college. *Id.* She indicated she had regularly worked for CSRA from March 2019 until November 28, 2019, and had subsequently worked on January 5 and 9, 2020. Tr. at 45–46.

Plaintiff testified she continued to have problems with her left knee giving way. Tr. at 46. She said she treated arthritis in her hands with Humira. *Id.* She indicated she was right-handed. *Id.* She denied that either hand was consistently more painful than the other, noting one would be worse on one day and the other would be worse on another day. *Id.* She stated she had chronic hives that caused itching and flare-ups in her hands. *Id.* She said her lips would sometimes swell. *Id.* She admitted the infusions were helping to decrease the frequency of her hives. *Id.* She indicated she had been experiencing the hives for two years. Tr. at 47. She described pain in her feet due to arthritis. *Id.* She stated she experienced blurred vision. *Id.*

Plaintiff estimated she could sit in a chair for 30 minutes at a time. *Id.* She said she could walk for about five minutes. *Id.* She stated a gallon of milk was the heaviest item she lifted. *Id.* She said she had difficulty washing her feet when she bathed. Tr. at 48. She denied side effects from medications. *Id.* She indicated stress and depression caused her difficulty falling asleep. *Id.* She said she sometimes napped for five to 10 minutes and spent most of her day lying in bed and watching television. *Id.* She said her children's father

transported her to medical visits, helped her perform household chores, and prepared meals. Tr. at 48–49.

Plaintiff testified she sustained an injury to her left knee in October 2015. Tr. at 49. She said her knee was unstable following the injury. *Id.* She stated she subsequently underwent surgery and participated in PT. *Id.* She indicated she had been unable to perform normal activities with her knee until late 2018. Tr. at 50. She denied being able to squat and crouch a year after surgery. *Id.* She stated her knee continued to give way and her doctor had given her a new brace. Tr. at 52.

Plaintiff stated she had PEs in 2016 and 2018 that were accompanied by chest pain and shortness of breath. Tr. at 50. She confirmed she was receiving injections to treat autoimmune disease and RA. Tr. at 51. She admitted she received Xolair injections every two weeks and indicated they were providing significant relief of swelling. *Id.*

Plaintiff testified she noticed arthritic symptoms in her hands around 2018. Tr. at 52. However, following more specific questioning from her attorney, Plaintiff admitted she was experiencing periodic pain and swelling in her right hand in April 2016. *Id.* She said she had difficulty bathing herself, as the water sometimes increased the pain in her hands, and caused difficulty picking up items due to joint pain. Tr. at 53.

Plaintiff testified she had some difficulty performing her job due to swelling in her lips. Tr. at 53–54. She indicated she called in sick to work once or twice during some weeks. Tr. at 54.

Plaintiff confirmed she used a cane to ambulate to the hearing location. *Id.* She indicated she had consistently used the cane since her knee injury due to instability. Tr. at 55. She stated she had undergone a total of three surgeries on her left knee. *Id.*

Plaintiff testified she experienced pounding in her chest due to anxiety. Tr. at 57. She stated this occurred randomly. *Id.* She said Dr. Kingery had instructed her to elevate her feet to reduce swelling. Tr. at 58, 59. She reported she elevated her feet for most of a typical day. Tr. at 58. She said she started using the cane on her own because she was having trouble with balance and continued to use it when she left her home. Tr. at 59.

b.    Vocational Expert Testimony

i.    May 10, 2018

Vocational Expert ("VE") William W. Stewart, Ph.D., reviewed the record and testified at the hearing. Tr. at 86–91.[3] He classified Plaintiff's PRW as a nursing assistant, *Dictionary of Occupational Titles* ("*DOT*") No. 355.674-014, requiring medium exertion and a specific vocational preparation

---

[3] The undersigned has only summarized the portion of Dr. Stewart's testimony that the ALJ relied on in her decision. The ALJ called another VE at the second hearing, and her findings as to Plaintiff's ability to perform specific jobs is based on the second VE's testimony.

("SVP") of 4. Tr. at 86. He indicated his review of the record suggested Plaintiff had performed her PRW with an SVP of 3. *Id.* He confirmed that an individual limited to sedentary work would be unable to perform Plaintiff's PRW. *Id.*

ii        February 12, 2020

VE Carroll Crawford reviewed the record and testified at the hearing. Tr. at 60–63. The VE classified the work Plaintiff had recently performed as a home health aide, *DOT* No. 354.377-014, requiring medium exertion and an SVP of 3. Tr. at 60. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the sedentary exertional level, lifting 10 pounds occasionally and less than 10 pounds frequently, sitting up to six hours in an eight-hour workday, and standing or walking up to two hours in an eight hour workday with the following additional restrictions: no use of the left foot and leg for pushing foot pedals or foot controls; no climbing ladders; occasional stooping, crouching, kneeling, and crawling; frequent balancing and stair climbing; frequent handling, fingering, and reaching, both overhead and in other directions; no exposure to unprotected heights or dangerous moving machinery; occasional exposure to respiratory irritants; and occasional exposure to wetness. *Id.* The VE testified the hypothetical individual could perform sedentary work with an SVP of 2 as a weight tester, *DOT* No. 539.485-010, a nut sorter, *DOT* No. 521.687-086, and a bench-hand

38

worker, *DOT* No. 715.684-026, with 90,000, 98,000, and 80,000 positions in the national economy, respectively. Tr. at 61.

The ALJ next asked the VE to consider that the individual would have to use a cane on a frequent basis while performing the standing and walking requirements of a job. *Id.* She asked how the additional restriction would affect the availability of the jobs the VE previously identified. *Id.* The VE stated the additional restriction would not interfere with the individual's ability to perform any of the jobs. *Id.*

The ALJ asked the VE to further assume the individual would be limited to occasional handling and fingering. *Id.* She asked how the restriction would affect the jobs the VE previously identified. *Id.* The VE testified there would be no unskilled work available if an individual were limited to handling and fingering for one-third of the workday. *Id.*

The ALJ asked the VE to consider that the individual would have to elevate her legs to waist-level during the workday, for periods in excess of normal breaks. Tr. at 62. She asked if the jobs the VE identified or other jobs would be available. *Id.* The VE testified there would be no jobs. *Id.*

The ALJ asked the VE to consider that the individual would be unable to consistently work eight hours a day, five days a week or would miss two or more days of work per month. *Id.* She asked if the jobs the VE identified or

other jobs would be available. *Id.* The VE testified the individual would be unable to engage in full-time work. *Id.*

The ALJ asked the VE to consider that the individual would be unable to maintain attention and focus for as long as two hours at a time due to pain or would require more than a 15-minute morning break, 30-minute lunch break, and 15-minute afternoon break. *Id.* She asked if the jobs the VE previously identified or other jobs would be available. *Id.* The VE testified there would be no jobs. *Id.*

The ALJ asked the VE if his testimony had been consistent with the *DOT*. *Id.* The VE testified his testimony had been consistent with the *DOT* and he had supplemented the information in the *DOT* with his opinion as to breaks, absences, elevating the legs, and using a cane based on his experience of observing work and dealing with employers over many years. *Id.*

Plaintiff's attorney asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited to sitting for four hours in an eight-hour workday, standing and walking for one hour each in an eight-hour workday, and would need to shift positions at will. Tr. at 62–63. He asked if the individual would be able to complete a normal workday. Tr. at 63. The VE testified the individual would be unable to perform full-time work. *Id.*

2.    The ALJ's Findings

In her decision dated March 10, 2020, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2021 (14D).

2.    The claimant has not engaged in substantial gainful activity since October 24, 2015, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.) (3D–14D, 1E, 4E, 19E, 28E, hearing testimony).

3.    The claimant has the following severe impairments: left knee degenerative joint disease, carpal tunnel syndrome, history of pulmonary embolism, seronegative rheumatoid arthritis/ polyarthralgia, idiopathic urticaria, and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work (lift, carry, push, or pull 10 pounds occasionally and less than 10 pounds frequently; stand or walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday), as defined in 20 CFR 404.1567(a) and 416.967(a) except with the following limitations, she can never use pedals/foot controls with her left lower extremity. She can frequently handle, finger and reach with her bilateral upper extremities. She can never climb ladder/rope/scaffolds. She can occasionally stoop, crouch, kneel, and crawl. She can frequently climb ramp/stairs and balance. She can have no exposure to unprotected heights or dangerous moving machinery. She can have occasional exposure to respiratory irritants and wetness.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on August 17, 1976 and was 39 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 24, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 18–28.

## II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ did not explain her RFC assessment as required pursuant to SSR 96-8p; and

2) the ALJ failed to properly evaluate Dr. Kingery's opinions.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

### A. Legal Framework

#### 1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4)

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform

---

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, she may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v.*

*Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    RFC Assessment

Plaintiff argues the ALJ did not explain her RFC assessment as required by SSR 96-8p. [ECF No. 13 at 17]. She maintains the ALJ ignored evidence as to ongoing symptoms of RA/polyarthralgia and idiopathic urticaria and failed to account for the impairments in the RFC assessment. *Id.* at 19–21. She contends the ALJ did not explain how she could perform frequent handing and fingering, given her carpal tunnel syndrome, polyarthralgia, and flares of cellulitis. *Id.* at 21–22. She claims the ALJ failed

to consider evidence that suggested degenerative joint disease of her left knee had prevented her from performing the RFC she assessed from October 2015 through at least November 2016. *Id.* at 22.

The Commissioner argues the ALJ assessed an RFC that captures all of Plaintiff's credibly-established limitations and adequately explained her conclusions. [ECF No. 15 at 18]. She maintains the ALJ's RFC assessment is based, in part, on Dr. Byrd's observations. *Id.* at 18–19. She contends the most compelling fact supporting the ALJ's RFC assessment was Plaintiff's ability to work in a job requiring medium exertion as a home health aide over the relevant period. *Id.* at 19. She claims the ALJ specifically considered RA, idiopathic urticaria, history of PE, obesity, left knee impairments, and carpal tunnel syndrome in assessing Plaintiff's RFC. *Id.* at 20.

To assess the claimant's RFC, the ALJ must determine which limitations the claimant's impairments impose and how those limitations affect her ability to perform work-related physical and mental abilities on a regular and continuing basis. SSR 96-8p. A claimant's RFC "is the most [she] can still do despite [her] limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ must "consider all of the claimant's 'physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect [the claimant's] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826

F.3d 176, 188 (4th Cir. 2016)); *see also* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) (providing the adjudicator should consider all the medically-determinable impairments of which she is aware, including those that are not "severe").

"A proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion. *Id.* The ALJ cannot neglect the second component, as "[a] necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288 (4th Cir. 2013). Thus, the ALJ must include a narrative discussion that cites "specific medical facts (e.g., laboratory findings), and non-medical evidence (e.g., daily activities, observations)" and explains how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7.

In determining a claimant's RFC, the ALJ is required to consider all the relevant evidence in the case record. 20 C.F.R. §§ 404.1520(a)(3), 404.1545(a)(3)m 416.920(a)(3), 416.945(a)(3). This requires the ALJ to consider the claimant's medical history, statements from medical sources, and descriptions and observations of limitations that result from symptoms from the claimant and others. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

The ALJ found Plaintiff's severe impairments included left knee degenerative joint disease, carpal tunnel syndrome, history of PE, seronegative RA/polyarthralgia, idiopathic urticaria, and obesity. Tr. at 19. She discussed the RFC assessment as follows:

> The claimant's left knee degenerative joint disease limits her to perform sedentary work (lift, carry, push, or pull 10 pounds occasionally and less than 10 pounds frequently; stand or walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday); never use pedals/foot controls with her left lower extremity; never climb ladder/rope/scaffolds; occasionally stoop, crouch, kneel, and crawl; and frequently climb ramp/stairs and balance.

Tr. at 21. The ALJ wrote: "The claimant's carpal tunnel syndrome limits her to perform sedentary work (lift, carry, push, or pull 10 pounds occasionally and less than 10 pounds frequently); frequently handle, finger, reach, and reach overhead with her bilateral upper extremities; never climb ladder/rope/scaffolds; and occasionally crawl." Tr. at 22. The ALJ further found:

> The claimant's history of pulmonary embolism, seronegative rheumatoid arthritis/polyarthralgia, idiopathic urticaria, and obesity limits her to perform sedentary work (lift, carry, push, or pull 10 pounds occasionally and less than 10 pounds frequently; stand and or walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday); never climb ladder/rope/scaffolds; occasionally stoop, crouch, kneel, and crawl; frequently climb ramp/stairs and balance; have no exposure to unprotected heights or dangerous moving machinery; and have occasional exposure to respiratory irritants and wetness.

*Id.*

Although Plaintiff argues to the contrary, the record reflects the ALJ thoroughly discussed evidence as to RA/polyarthralgia and idiopathic urticaria in explaining the RFC assessment. The ALJ maintained the evidence did not warrant additional functional limitations. Tr. at 23. She acknowledged that RA/polyarthralgia and idiopathic urticaria resulted in periods of increased functional limitations from time to time, but were effectively treated such that they did not present ongoing functional limitations. Tr. at 23–24. She recognized that RA/polyarthralgia resulted in swelling and TTP in Plaintiff's hands in July 2017 and swelling, TTP, and decreased ROM in January 2018, but that she had normal findings in October 2017 and during Dr. Byrd's exam in June 2018. Tr. at 23, 24. She cited diagnoses of right upper extremity cellulitis on three occasions, but noted it responded well to medication. Tr. at 23. She noted evidence of superficial vein thrombosis in the mid-cephalic vein in August 2017, but referenced other negative ultrasounds. *Id.* She concluded that Plaintiff's urticaria generally resolved since starting infusions. *Id.*

Plaintiff claims the ALJ failed to consider to her treatment for rashes, burning, edema, and cellulitis on 22 occasions in 2017. [ECF No. 13 at 20]. The record reflects that Plaintiff frequently presented to medical providers with such symptoms, but Plaintiff is stringing together multiple impairments, as her symptoms were often attributable to different sources

that included carpal tunnel syndrome, RA/polyarthralgia, urticaria, and cellulitis. Plaintiff presented with hand pain, tingling, and burning on January 25 and 30 and February 17, 2017, and her providers observed signs consistent with carpal tunnel syndrome. *See* Tr. at 723–27, 730–31, 797–99. As the ALJ noted, EMG and NCS were negative, and her symptoms responded to an injection. *See* Tr. at 22. Plaintiff also presented to providers on multiple occasions with swelling, tenderness, and reduced ROM in her hands and feet that were related to RA/polyarthralgia. *See* Tr. at 733, 739–43, 805–07, 852, 983–85. However, as the ALJ noted, Plaintiff's symptoms related to RA/polyarthralgia improved beginning in October 2017 and she had only mild symptoms in January 2018. *See* Tr. at 23; *see also* Tr. at 879, 907. As the ALJ acknowledged, Plaintiff was treated for cellulitis on three occasions, and it resolved with treatment.[6]  Tr. at 23; *see also* Tr. at 802–04, 1121 (hospitalization for right arm cellulitis and sepsis April 21–27, 2017); Tr. at 1162 (hospitalization June 13–18, 2017 for cellulitis of the right hand); Tr. at 1503–04 (treatment for cellulitis on January 10, 2020). As she also recognized, Plaintiff was treated for SVT in her right upper extremity in August 2017. Tr. at 23. During other visits in 2017 and thereafter, Plaintiff presented with hives and itching, burning, and redness in her arms and

---

[6] Although the ALJ indicated Plaintiff was treated for cellulitis in May and June 2017 and January 2018, Tr. at 23, the record reflects treatment for cellulitis in April and June 2017 and January 2020. *See* Tr. at 802–04, 1121, 1162, 1503–04

hands that appeared to be related to urticaria. *See* Tr. at 747, 753, 768, 765–67, 800–01, 811, 1285, 1301, 1317, 1325, 1443–45, 1450–53.

Although Plaintiff claims the ALJ erred in concluding that symptoms of urticaria were resolved on infusion treatment, ECF No. 13 at 20, her conclusion is generally well-supported. The record reflects Plaintiff initially reported good response to Xolair infusion treatment. *See* Tr. at 1370, 1377, 1382, 1396, 1454. She was subsequently unable to obtain infusion treatment between November 2018 and March 2019 due to an insurance problem. Tr. at 1458. She reported mixed response to treatment after restarting Xolair infusions in March 2019. *See* Tr. at 1400–13. However, after Xolair infusions were increased to every two weeks in September 2019, Plaintiff reported improved symptoms at subsequent visits. Tr. at 1415–23, 1426–42, 1464, 1480. Thus, while Plaintiff's symptoms were exacerbated at times, the overall record shows good response to Xolair infusions.

Although Plaintiff maintains the ALJ did not explain how an individual with decreased strength, swelling, and tenderness of her fingers could perform frequent handling and fingering, ECF No. 13 at 21, she was not required to do so, as she explained her conclusion that these symptoms did not persist after appropriate medication regimens were initiated. *See* Tr. at 23. Symptoms related to urticaria persisted after 2017, but the undersigned's review of the record does not suggest these symptoms affected Plaintiff's

upper extremity strength or ROM such that she could not have performed frequent handling and fingering.

Although Plaintiff argues the ALJ failed to consider evidence that suggested her left knee impairment prevented her from engaging in the work described in the RFC assessment between October 2015 and November 2016, ECF No. 13 at 23–24, the ALJ explained the evidence did not support additional functional limitations over that period. The ALJ acknowledged Plaintiff's injury; x-ray and MRI results; December 2015 left knee arthroscopy and ACL reconstruction; February 2016 left knee manipulation; observations of reduced ROM, pain, joint swelling, and weakness during exams between January and November 2016; November 2016 left knee arthroscopy with synovectomy and manipulation; findings of improved ROM and stable collateral ligaments in January and February 2017; June and July 2017 rheumatology exams findings of mild diffuse tenderness in her ankles and feet; left knee ROM to 125 degrees with good stability and only mild quadriceps weakness in July and October 2017; left lower extremity swelling in March 2018; and x-rays, exam showing reduced ROM of the left knee and positive drawer and Lachman's tests, administration of an injection, and order for a knee brace in October 2019. Tr. at 21–22. She cited mixed evidence as to Plaintiff's gait, station, and use of an ambulatory assistive device. Tr. at 22. She wrote "based upon the above objective evidence,

including that her cane is not prescribed and that many exams show normal gait and station with no assistive device, I have not included related limitations in the RFC." *Id.* She noted: "No provider has indicated that a cane is medically necessary." *Id.*

The ALJ's explanation shows that she evaluated evidence as to Plaintiff's ability to ambulate, concluded a cane was not necessary, and determined the reduced range of sedentary work she included in the RFC assessment was sufficient. However, as discussed below, it is not evident that the ALJ evaluated Dr. Kingery's opinions as required pursuant to the applicable regulations and SSRs in concluding that Plaintiff's left lower extremity impairment did not impose additional limitations, particularly between October 2015 and November 2016.

### 2.    Dr. Kingery's Opinions

On March 29, 2016, Dr. Kingery wrote: "Patient unable to work estimate of 2–4 months. She has been unable to work since 10/25/2015." Tr. at 599.

On April 12, 2016, Dr. Kingery wrote: "The patient will be out of work an extended period of time 6 months to one year." Tr. at 649. He provided this impression after learning that Plaintiff had been diagnosed with PE and was undergoing anticoagulation treatment.

Dr. Kingery completed a physical capacities evaluation form on August 9, 2016. Tr. at 678–79. He indicated Plaintiff could sit for four hours, stand for one hour, and walk for one hour in an eight-hour workday. Tr. at 678. He noted Plaintiff could frequently lift one to 10 pounds and occasionally lift 11 to 20 pounds. *Id.* He felt that Plaintiff could never stoop (bend) or kneel; occasionally crouch; and frequently twist and climb stairs. *Id.* He stated Plaintiff would require a job that would permit shifting positions at will from sitting, standing, or walking on an hourly basis. *Id.* He indicated Plaintiff could occasionally reach below waist-level; frequently reach above her shoulders and at waist-level; and constantly handle, finger, and feel. Tr. at 679. He considered Plaintiff capable of using her right foot, right hand, and left hand on a repetitive basis, but incapable of using her left foot on a repetitive basis. *Id.* He indicated Plaintiff's leg should be elevated on a chair or stool for 30% of an eight-hour workday. *Id.* He noted Plaintiff must use a cane when engaging in occasional standing/walking. *Id.* He stated the restrictions he provided were supported by prior knee ligament injury and surgery and severe postoperative stiffness. *Id.* He indicated the limitations had begun in October 2015 and had lasted or could be expected to last at least 12 months. *Id.* He did not consider Plaintiff to be employable on a full-time basis in a competitive work environment that would not accommodate her restrictions. *Id.*

On May 23, 2017, Dr. Kingery authorized Plaintiff to receive a disabled parking placard for permanent impairment in mobility. Tr. at 688. He affirmed that Plaintiff had an inability to ordinarily walk one hundred feet nonstop without aggravating an existing medical condition, including the increase of pain. Tr. at 689.

Plaintiff argues the ALJ failed to evaluate Dr. Kingery's opinions based on the applicable factors in 20 C.F.R. § 404.1527(c) and § 416.927(c) and provided reasons for rejecting the opinion that were not among the relevant factors to be considered. [ECF No. 13 at 26]. She maintains the ALJ erred in rejecting the opinion as one on an issue reserved to the Commissioner because Dr. Kingery specifically opined that she had difficulty with any ambulation. *Id.* at 26–27. She contends that evaluation of Dr. Kingery's opinion based on the relevant factors in 20 C.F.R. § 404.1527(c) and § 416.927(c) suggests the opinion is entitled to significant weight. *Id.* at 27.

The Commissioner argues the ALJ addressed the relevant factors in 20 C.F.R. § 404.1527(c) and § 416.927(c) by acknowledging that Dr. Kingery was a treating specialist, was Plaintiff's treating orthopedist, treated her on a regular and continuing basis, and prescribed medications and other treatments. [ECF No. 15 at 15]. She maintains the ALJ assigned little weight to Dr. Kingery's opinions because they were (1) "given in the course of treatment and not as part of the claimant's disability claim"; (2) provided

56

prior to Plaintiff's second surgery, which helped to improve her ROM and strength; and (3) addressed the ultimate issue of disability, which is one reserved to the Commissioner. *Id.* at 15–18.

Because Plaintiff filed her claims prior to March 27, 2017, the ALJ was required to evaluate the medical opinions based on the rules in 20 C.F.R. § 404.1527 and § 416.927 and SSRs 96-2p, 96-5p, and 06-3p. *See* 20 C.F.R. § 404.1520c, 416.920c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 [416.927] apply"); 82 Fed. Reg. 15,263 (providing the rescissions of SSRs 96-2p, 96-5p, and 06-3p were effective "for claims filed on or after March 27, 2017").

The applicable regulations and SSR recognize a "treating physician rule." *See Dowling v. Commissioner of Social Security Administration*, 986 F.3d 377, 384 (4th Cir. 2021); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p. Under this rule, "the medical opinion of a treating physician is entitled to 'controlling weight' if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (citing 20 C.F.R. § 404.1527(c)(2)). "[T]reating physicians are given 'more weight . . . since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical findings alone[.]" *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).

"[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 174 (4th Cir. 2011) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). However, her decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record" and must be "sufficiently specific to make clear" to the court "the weight [she] gave to the . . . opinion and the reason for that weight." SSR 96-2p, 1996 WL 374188, at *5.

If the ALJ declines to accord controlling weight to a treating physician's opinion, she must weigh it, along with the other medical opinions of record, based on the factors in 20 C.F.R. § 404.1527(c) and § 416.927(c). Pursuant to 20 C.F.R. § 404.1527(c) and § 416.927(c), "if a medical opinion is not entitled to controlling weight under the treating physician rule, an ALJ must consider each of the following factors to determine the weight the opinion should be afforded: (1) the '[l]ength of the treatment relationship and the frequency of examination'; (2) the '[n]ature and extent of the treatment relationship'; (3) '[s]upportability,' i.e., the extent to which the treating physician 'presents relevant evidence to support [the]medical opinion'; (4) '[c]onsistency,' i.e., the

extent to which the opinion is consistent with the evidence in the record; (5) the extent to which the physician is a specialist opining as to 'issues related to his or her area of specialty'; and (6) any other factors raised by the parties 'which tend to support or contradict the medical opinion.'" *Dowling*, 986 F.3d at 384–85 (citing 20 C.F.R. § 404.1527(c)(2)(i)–(6)). The court explained the ALJ "was required to consider each of the six 20 C.F.R. § 404.1527(c) factors before casting [the] opinion aside." *Id.* at 385. It further noted "[w]hile an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician, it must nonetheless be apparent from the ALJ's decision that he meaningfully considered *each* of the factors before deciding how much weight to give the opinion." *Id.* (emphasis in original) (citing *Arakas*, 983 F.3d at 107 n.16 ("20 C.F.R. § 404.1527(c) requires ALJs to consider all of the enumerated factors in deciding what weight to give a medical opinion.") (emphasis in original)); *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000) (agreeing with the "[s]everal federal courts [that] have concluded that an ALJ is required to consider each of the § 404.1527(c) factors" when weighing the medical opinion of a treating physician)).

After addressing evaluation of medical opinions generally and stating she had "considered factors such as length of the treatment relationship, and the frequency of examination; nature and extent of the treatment

relationship; supportability; consistency; specialization; and other factors, the

ALJ addressed Dr. Kingery's opinion as follows:

> Turning to the opinions of David Kingery, M.D., he is a medically acceptable treating specialist, is the claimant's treating orthopedist, has treated her on a regular and continuing basis, and has prescribed medications and other treatment modalities (see e.g. 4F, 6F–9F, 11F, 15F, 19F, 22F, 27F, 48F, 52F).
>
> I give little weight to Dr. Kingery's March and April 2016 opinions (11F/1, 15F/1). These opinions were given in the course of treatment and not as part of the claimant's disability claim. Further, Dr. Kingery gave these opinions prior to the claimant's second knee arthroscopy in November 2016, which resulted in improved range of motion and strength (see e.g. 22F/17, 27–28). Finally, the ultimate issue of disability is an issue reserved to the Commissioner.
>
> Regarding the May 2017 disabled parking placard/license plate application signed by Dr. Kingery (20F, 22F), I noted that it is not really an opinion. However, to the extent that it implies a less than sedentary RFC, it is given little weight, as fully explained below.
>
> However, I give some weight to Dr. Kingery's August 2016 opinion (18F). Again, Dr. Kingery gave this opinion prior to the claimant's November 2016 second knee arthroscopy, which resulted in improved range of motion and strength (see e.g. 22F/17, 27–28). The longitudinal record does not support a less than sedentary RFC. However, this opinion is part the basis for the above sedentary RFC.

Tr. at 25.

> The ALJ subsequently explained:
>
> After the claimant's November 2016 second left knee arthroscopy, exams showed that although her left knee had some continued reduced range of motion, it also had good stability and much improved muscle strength (see e.g. 52F/3–4, 7, 28F/63; see also 23F/4, 10; 33F/63, 35F/84, 48F). Further, many exams showed

> normal gait and station, for example in January, April, July,
> December 2017, January, and October 2018, March, May,
> August, September, and December 2019 (see e.g. 24F/3, 12, 20,
> 23, 25F/15; 28F/55, 83, 51F/13, 53F/3, 9, 18, 21, 41).

Tr. at 26. She noted Plaintiff's "ADLs, including performing light household

chores, such as occasional dusting, sweeping, and washing clothes, as well as

occasionally grocery shopping with a motorized cart (5E, 11E, 31F/3)," and

her work "part time as a home health aide, where she assists the elderly

(bathing, cooking, and helping with basic needs) in their homes," supported

the weight she allocated to the medical opinions. *Id.*

Substantial evidence supports the ALJ's reasons for giving little weight

to Dr. Kingery's March and April 2016 opinions. The March and April 2016

opinions were statements as to the ultimate issue of disability, which are

reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

The ALJ's discussion of the March, April, and August 2016 opinions and the

May 2017 opinion generally reflect her acknowledgment of the relevant

factors in 20 C.F.R. § 404.1527(c) and § 416.927(c). *See* Tr. at 25. She

conceded Dr. Kingery's opinion was bolstered by his status as Plaintiff's

orthopedic specialist, who provided treatment on a regular and continuing

basis. Tr. at 25. However, the ALJ appears to have determined Dr. Kingery's

opinions were entitled to less-than-significant weight because they were not

supported by his records or consistent with the other evidence. *See* Tr. at 25–

26. In reaching this conclusion, the ALJ did not adequately explain her

allocation of some weight to Dr. Kingery's August 2016 opinion, stating only that "the longitudinal record d[id] not support a less than sedentary RFC." *See id.*

Although the above statement is conclusory in isolation, it would be sufficient if a review of the ALJ's decision revealed that she had cited adequate reasons elsewhere for rejecting the additional functional limitations Dr. Kingery provided. The explanation that followed her statement only addressed evidence after November 2016. *See* Tr. at 26. She did not consider whether Plaintiff was further limited between October 2015 and November 2016. The ALJ's earlier discussion of the evidence sheds no light on her conclusions, as she only summarized evidence of procedures and positive and negative imaging reports and observations. *See* Tr. at 21–22. Furthermore, Dr. Kingery opined as to several specific restrictions the ALJ failed to directly address. He indicated Plaintiff could perform a combined total of six hours of sitting, standing, and walking, which would not allow for completion of an eight-hour workday. *See* Tr. at 678. Although the ALJ found Plaintiff could stand or walk for two hours in an eight-hour workday and sit for six hours in an eight-hour workday, she did not explain why she found Plaintiff capable of sitting for a longer period than Dr. Kingery suggested. *See* Tr. at 21. Dr. Kingery indicated Plaintiff could never stoop (bend) or kneel, Tr. at 678, but the ALJ found Plaintiff could occasionally perform those postural functions,

Tr. at 21, without reconciling her assessment of different restrictions. Dr. Kingery indicated Plaintiff's leg should be elevated on a chair or stool for 30% of an eight-hour workday. Tr. at 679. The ALJ acknowledged this restriction, but noted only that it was offered "prior to her second left knee arthroscopy in November 2016." Tr. at 22. While it appears she declined to include a provision in the RFC assessment for elevation of the left leg based on improvement to Plaintiff's left knee following the November 2016 surgery, she gave no reason for dismissing the restriction as applicable between October 2015 and November 2016. Finally, the ALJ did not address whether Plaintiff's surgical history and evidence of postoperative stiffness supported Dr. Kingery's opinion, as he indicated it did. *See* Tr. at 679.

The ALJ failed to support her rejection of parts of Dr. Kingery's August 2016 opinion with evidence in the case record, as required pursuant to SSR 96-2p. Because the ALJ did not reconcile inconsistencies between the RFC she assessed and Dr. Kingery's opinion, substantial evidence does not support her RFC assessment. *See* SSR 96-8p, 1996 WL  374184, at *7 ("The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.").

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

September 8, 2021                        Shiva V. Hodges
Columbia, South Carolina            United States Magistrate Judge